# DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

| | |
|---|---|
| CHARLES THOMAS POLEVICH<br><br>Plaintiff,<br><br>vs.<br><br>TOKIO MARINE PACIFIC INSURANCE LTD., CALVO'S INSURANCE UNDERWRITERS, INC., and DOES 1 through 20,<br><br>Defendants. | CIVIL CASE NO. 17-00001<br><br>**REPORT & RECOMMENDATION**<br>re Defendants' Motion for Summary Judgment (ECF No. 23) |

Pending before the court is a Motion for Summary Judgment filed by Defendants Tokio Marine Pacific Insurance Ltd. ("Tokio Marine") and Calvo's Insurance Underwriters, Inc. ("Calvo's").[1] *See* ECF No. 23. Chief Judge Ramona V. Manglona[2] referred said motion to the below-signed Magistrate Judge. *See* ECF No. 35. Defendants request summary judgment as to the Plaintiff's breach of contract claim in the Second Amended Complaint ("SAC"). Plaintiff opposes the motion. *See* ECF No. 29. The parties have not requested oral argument. Having reviewed all pertinent filings and relevant case law and based on the analysis set forth herein, the below-signed Magistrate Judge recommends Chief Judge Manglona grant the Motion for Summary Judgment.

---

[1] Tokio Marine and Calvo's shall jointly be referred to as the "Defendants."

[2] Chief Judge of the United States District Court for the Northern Mariana Islands, sitting by designation.

## BACKGROUND and FACTS

The facts appear to be undisputed. Calvo's administers a group health insurance plan known as "Calvo's SelectCare," which is underwritten by Tokio Marine. Decl. F. Campillo at ¶3, ECF No. 24. Among the insurance policies administered by Calvo's and underwritten by Tokio Marine is a group health insurance plan for the benefits of the employees of Allied Pacific Environmental Consulting, Inc. ("Allied Pacific"). *Id.* at ¶4. A copy of the Group Comprehensive Medical Insurance Policy (the "Policy") for Allied Pacific is attached as Exhibit A to the Declaration of Frank J. Campillo. *Id.* at ¶17 and Ex. A thereto.

Plaintiff Charles Thomas Polevich is the President and owner of Allied Pacific. SAC at ¶4, ECF No. 16. Plaintiff was an insured under the Policy. Decl. F. Campillo at ¶6, ECF No. 24.

While covered under the Policy, Plaintiff suffered a heart attack in December 2013 and required medical care from a number of service providers. SAC at ¶12, ECF No. 16.[3] Plaintiff's heart attack in December 2013 was a medical incident that was covered under the terms of the Policy. *Id.* at ¶13.[4] Plaintiff received medical treatment at St. Francis Hospital in Roslyn, New York. Decl. F. Campillo at ¶7, ECF No. 24.

According to Plaintiff's deposition, he first went to St. Francis Hospital on December 9, 2013, because he had "recurring incidents of pains that could be associated with cardiac issues." Decl. S. Forman, Ex. A ("Polevich Dep.") at 11-12,[5] ECF No. 25. He was diagnosed with having a "leaking aortic valve" which was "severe" and was scheduled for surgery the following day to replace the aortic valve. *Id.* at 12-13. The Plaintiff stated that he "couldn't do any calling" while at the hospital because he "wasn't exactly in a position to be on the telephone after [having] been split open and . . . in the ICU with a tube[,]" but his "family" – his sister and possibly his girlfriend – were in contact with Calvo's Selectcare. *Id.* at 15, 17. The Plaintiff testified that a person named

---

[3] Defendants admit this fact. *See* Answer to SAC at ¶12, ECF No. 17.

[4] Defendants admit this fact. *See* Answer to SAC at ¶13, ECF No. 17.

[5] These page numbers refer to the pages on the actual deposition transcript, not the page numbers on the ECF footer.

"Pinky" from Calvo's SelectCare "conveyed to [his] family . . . don't worry, everything will be taken care of." *Id.* at 15. The Plaintiff further stated that Pinky said "don't worry, it's an emergency, it will be covered." *Id.* The Plaintiff testified that he was not sure whether Pinky spoke with his sister or his girlfriend but that one of them relayed that Pinky said "don't worry, you'll be covered." *Id.* at 31.

The Plaintiff could not remember how long he remained at St. Francis Hospital after his surgery but that it was a "very rough time." *Id.* at 13. He stated that he experienced " a lot of complications" and was later brought back to the Emergency Room sometime in January 2014 for "emergency surgery to fix that problem with the collapsed bypass." *Id.* at 14. The Plaintiff remained in New York until July and continued to be treated at St. Francis Hospital. *Id.*

Christine Malin is the Plaintiff's sister. Decl. C. Malin at ¶3, ECF No. 32. According to her declaration, she learned about the Plaintiff's emergency hospitalization and immediate surgery through a phone call she received from her son. *Id.* at ¶4. She immediately flew from Louisville to New York, and when she arrived the Plaintiff was already in surgery. *Id.* Ms. Malin stated that she communicated with Karen Flores[6] by phone during this time. *Id.* at ¶5. She spent most of December 2013 with her brother at St. Francis Hospital prior to his discharge. *Id.* at ¶6. Ms. Flores did not arrive until "near the end of December." *Id.* They both "met with the doctors in charge to discuss matters related both to the discharge follow up visits and after care." *Id.*

According to Ms. Malin, sometime during the first of January 2014, she and Ms. Flores spoke with "Pinky Almazan at Calvo's, who said that she was the representative assigned to handle [Plaintiff's] insurance and medical expenses needs." *Id.* at ¶7. Ms. Malin claims that they spoke at least three times, and during these conversations, Pinky Almazan "assured us that [Plaintiff] was covered for all expenses, procedures, medications and treatments that he had already received and would/might be receiving in the future related to this emergency." *Id.* Ms. Malin further states that "[w]hen [she or Ms. Flores] individually spoke with Pinky, she mentioned that all [Plaintiff] would

---

[6] Ms. Flores is the Plaintiff's girlfriend. *See* Decl. S. Forman, Ex. B ("Flores Dep.") at 6, ECF No. 25.

be responsible for was his deductible." *Id.*

Ms. Malin returned to Kentucky in early January 2014 but returned to New York in early February 2014. *Id.* at ¶8. During that time, she and Ms. Flores again spoke with Pinky about the rehabilitation the Plaintiff required before he could return to Guam. *Id.* Ms. Malin asserts that Pinky "reassured" her and Ms. Flores "that the rehab sessions and treatment were covered by his insurance." *Id.*

According to Ms. Flores's deposition, she flew to New York on New Year's Eve to help care for the Plaintiff because Ms. Malin had to leave. Flores Dep. at 9, ECF No. 25. Ms. Flores testified that Ms. Malin spent perhaps the first ten days of January 2014 with Ms. Flores and Plaintiff, and it was during this time when they first contacted Calvo's SelectCare. *Id.* at 9-10. Ms. Flores stated that when they called Pinky Almazan,[7] "she assured us that everything was taken care of." *Id.* at 10. When asked to clarify what exactly was said, Ms. Flores stated that Pinky Almazan said, "Well, I can't see a problem with this and that everything should be taken care of." *Id.* Ms. Flores testified that Ms. Almazan then requested that they provide her with the name of a point of contact at St. Francis Hospital, which was subsequently provided in the next day or two. *Id.* Ms. Flores acknowledged that she had about four calls with Pinky while the Plaintiff was receiving medical treatment. *Id.* at 21-22. When asked to recall Pinky's exact words, Ms. Flores stated that "Pinky said that not to worry, that [Plaintiff] will be covered. . . . Those were her exact words, not once, not twice but three days in a row." *Id.* at 22. Ms. Flores interpreted Pinky's statements to mean that aside from a deductible, the Plaintiff's claim would be covered in full by the insurance. *Id.* at 22-23. This was the sentiment that she and Ms. Malin then relayed to the Plaintiff. *Id.* at 23-24. Ms. Flores further testified that no one from Calvo's SelectCare spoke directly with the Plaintiff until after a year or so later, when she and the Plaintiff met with Frank Campillo. *Id.* at 14, 21 and 24.

On February 1, 2014, Arlene Matanguihan, Utilization Review Manager for Calvo's

---

[7] Ms. Flores's transcript refers to her as "Pinky Amsalon." Flores Dep. at 10, ECF No. 25.

SelectCare, wrote to St. Francis Hospital. *See* Decl. J. Razzano, Ex. A,[8] ECF No. 31. In said letter, Ms. Matanguihan explained that Plaintiff had a $500 deductible which had not yet been met and that the plan would pay "70% of eligible charges*"[9] for "Emergency/Urgent Care" benefits since St. Francis Hospital was a "non-participating" provider.[10] *Id.* The letter further stated "*Eligible[11] charges for non-participating providers are limited to the lesser of actual charges or Medicare's participating provider fee schedule in the geographic location where the services was rendered. The covered person pays any excess eligible charges." *Id.* The letter went on to provide an example of how the Plaintiff's insurance coverage would apply. *Id.*

St. Francis Hospital submitted claims to Calvo's for treatment provided to Plaintiff. Decl. F. Campillo at ¶7, ECF No. 24. This included $382,958.70 for Plaintiff's initial treatment from December 9-21, 2013, and $118,298.00 for charges incurred after Plaintiff's readmission on January 12, 2014, for a total of $501,256.70. *Id.* There is some dispute as to the amount Calvo's paid St. Francis Hospital for Plaintiff's treatment.[12] The Defendants assert Calvo's paid $207,602.56. *Id.* at ¶8. Plaintiff claims his exhibits reflect a total of $172,809.21 was paid by Calvo's. Decl. J. Razzano at ¶5, ECF No. 31, and Ex. C thereto.

Calvo's has contracted with medical providers (referred to as "participating providers") in Guam, the continental United States and elsewhere to provide medical care to its insured members.

---

[8] Exhibit A to Mr. Razzano's declaration comprises of two pages marked "062" and "063" on the lower right corner. The 062 page is the February 1, 2014 letter from Ms. Matanguihan. The 063 page is a blank form entitled "Acknowledgement (sic) & Authorization for Release of Information."

[9] Asterisk ("*") in original.

[10] In reviewing the Section XXIII of the Policy entitled "Policy Specifications," it appears that the "70% of UCR Charges*" provision applies to emergency care an insured receives at an "Urgent Care Center." Here, however, the Plaintiff received emergency care at the St. Francis Hospital emergency room. As will be discussed *infra*, the Policy Specifications sets forth a different payment rate for services received at a hospital emergency room setting.

[11] Asterisk ("*") in original.

[12] Although there is a dispute as to the amount Calvo's paid, the court finds that this dispute is not material to the legal issues to be determined.

Decl. F. Campillo at ¶¶9-10, ECF No. 24. Medical providers who do not have contracts with Calvo's are referred to as "non-participating providers." *Id.* at ¶11. St. Francis Hospital does not have a contract with Calvo's and is thus considered a non-participating provider. *Id.* at ¶14.

Calvo's treated all of Plaintiff's treatment at St. Francis Hospital for the time period at issue as emergency treatment from a non-participating provider. *Id.* at ¶15. According to Mr. Campillo's declaration, "[i]n determining the amounts to be paid, Calvo's could have used Medicare's rate. Instead, Calvo's used the fee schedule for Good Samaritan Hospital in Los Angeles, California[, which] . . . is Calvo's most frequently used directly contracting participating provider in the United States." Decl. F. Campillo at ¶15, ECF No. 24. Calvo's asserts that "[t]he rates in Calvo's fee schedule for Good Samaritan Hospital in Los Angeles are substantially higher than Medicare rates." *Id.* at ¶16. Using said rates, Calvo's claims it paid $207,602.56 to St. Francis Hospital for the time period at issue. *Id.* at ¶8 and Ex. E thereto, ECF No. 24-5.[13] According to Mr. Campillo's calculations, using the Medicare rates would have only resulted in allowable payments totaling $72,100.85. Decl. F. Campillo, Ex. E, ECF No. 24-5.

The parties appeared to be at an impasse over whether Calvo's had complied with the coverage provided under the Policy. Accordingly, Plaintiff brought suit against Calvo's SelectCare on December 27, 2016, in the Superior Court of Guam. *See* Not. Removal at ¶1, ECF No. 1. Calvo's SelectCare then removed the action to this court based on the court's federal question jurisdiction over provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq. Id.* at ¶2.

On April 3, 2017, Plaintiff filed an Amended Complaint against Defendants Tokio Marine and Calvo's.[14] *See* ECF No. 8. The Amended Complaint asserted two causes of action: Breach of

---

[13] Exhibit E is a three-page document. The first two pages appear to contain a spreadsheet of the claims Calvo's paid for the Plaintiff's first and second admission to St. Francis Hospital. The third page is a spreadsheet of other charges incurred by the Plaintiff on other dates not directly related to his first and second hospital admission. The $207,602.56 figure is the sum of Calvo's payments for the first two pages of Exhibit E.

[14] Calvo's SelectCare was not named as a defendant in the Amended Complaint.

Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. *Id.*

On April 20, 2017, Defendants filed a Motion to Strike, specifically requesting that the Breach of Implied Covenant of Good Faith and Fair Dealing be struck from the Amended Complaint, in addition to paragraphs 19 and 26 pertaining to alleged consequential damages, paragraph 27 in so far as it sought punitive damages, the prayer for relief seeking compensatory damages, and Plaintiff's jury demand. *See* ECF No. 11. In lieu of opposing the motion to strike, the parties stipulated that the Plaintiff would amend the Amended Complaint "to remove the allegations that are the subject of the Defendants' [m]otion." Stip. Amend Compl., ECF No. 14.

On May 31, 2017, the court granted the stipulation, and the Plaintiff filed the SAC on June 9, 2017, which only asserted a Breach of Contract claim. *See* SAC, ECF No. 16.

On June 23, 2017, the Defendants filed an Answer to the SAC. *See* ECF No. 17.

The instant summary judgment motion was thereafter filed and referred to the below-signed judge.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55, (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157. The moving party must identify the pleadings, depositions, affidavits, or other evidence which the moving party "believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A material issue of fact

is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. To successfully rebut a properly supported motion for summary judgment, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff[ ]'s favor, could convince a reasonable jury to find for the plaintiff[ ]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000).

Additionally, "[t]he [court is not obligated to consider matters not specifically brought to its attention." *Katherine G. ex rel. Cynthia G. v. Kentfield Sch. Dist.*, 261 F. Supp.2d 1159, 1167 (N.D. Cal. 2003), *aff'd sub nom. Katherine G. v. Kentfield Sch. Dist.*, 112 F. App'x 586 (9th Cir. 2004). *See also Schneider v. TRW, Inc.*, 938 F.2d 986, 990-91 n.2 (9th Cir. 1991) ("[T]he law of this circuit . . . recognizes that a district court is under no obligation to mine the full record for triable issues of fact.") (citation omitted). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

**ANALYSIS**

As noted, this action arises under ERISA, 29 U.S.C. § 1001 *et seq*. The statute provides that a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Here, the Plaintiff's SAC asserts a Breach of Contract claim based on the Defendants' alleged failure to pay medical expenses he believes are covered by the Policy. Defendants now move for summary judgment on the basis that they made all payments required under the terms of the Policy. Thus, the court must first examine the Policy's language to determine whether the Defendants paid the medical expense benefits covered by the Policy.

///

1.    Whether Defendants complied with the Policy

The Defendants assert they have complied with all their responsibilities under the Policy and have made payments in excess of what the Policy requires, and thus they request that summary judgment be granted in their favor. *See* Mot. Summ. J. at 6, ECF No. 23. The Plaintiff, on the other hand, asserts that summary judgment is premature at this stage because there is a dispute about the interpretation of Policy's coverage for emergency medical services provided by non-participating providers such as St. Francis Hospital. The Plaintiff asserts that the Defendants have made various conflicting statements about the Policy's coverage benefits. He notes that Ms. Matanguihan's February 1, 2014 letter stated that coverage for emergency services at a non-participating provider would be "70% of eligible charges" less the Plaintiff's $500 deductible. The Plaintiff then notes that Mr. Campillo first claimed in a May 24, 2016 letter that the Plaintiff's first visit to the emergency room appeared to be a foreseen event, *see* Decl. J. Razzano, Ex. B, ECF No. 31, Mr. Campillo's later testified at his deposition that the Defendants "never disagreed that was not an emergency." Decl. J. Razzano, Ex. E ("Campillo Dep.") at 19, ECF No. 31. The Plaintiff argues that if the Defendants agreed that the Plaintiff received emergency medical services at St. Francis Hospital, then the terms of the Policy would require that all charges would be covered other than the Plaintiff's $100 co-payment. *See* Opp'n at 5, ECF No. 29. Instead of covering all emergency care charges, however, the Plaintiff notes that Mr. Campillo testified that he applied "the usual, customary and reasonable" definition to the services received at St. Francis Hospital. Campillo Dep. at 19-20. The Plaintiff asserts that this application "allow[ed] Calvo's the unilateral ability to reduce their coverage based on its own interpretation of the insured's situation." Opp'n at 5, ECF No. 29. The Plaintiff contends that these various interpretations of the Policy's provisions preclude the granting of summary judgment for the Defendants.

The parties appear to generally agree that the Defendants' liability for the medical services provided to the Plaintiff are governed by the terms of the Policy.[15] The parties, however, disagree

---

[15] *See* Mot. Summ. J. at 6, ECF No. 23 ("'The amount or extent of the insurance company's liability under a policy of health insurance must be determined by the terms of the policy or statutes.'") and Opp'n at 7, ECF No. 29 ("Mr. Polevich only seeks what is due under the contract.").

as to the legal interpretation of the applicable provisions of the Policy as applied to the emergency services rendered at St. Francis Hospital.

Under Ninth Circuit case law,

> When faced with questions of insurance policy interpretation under ERISA, federal courts apply federal common law. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S. Ct. 948 (1989); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98, 103 S. Ct. 2890, 77 L. Ed.2d 490 (1983) (holding that federal common law of ERISA preempts state law in the interpretation of ERISA benefit plans). Under the federal common law of ERISA, we "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (internal quotations and citation omitted). As we develop federal common law to govern ERISA suits, we may "borrow from state law where appropriate, and [be] guided by the policies expressed in ERISA and other federal labor laws." *Id.* (internal quotations and citation omitted).

*Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002).

Here, borrowing from "state law" as instructed by the Ninth Circuit, the court notes that

> [u]nder Guam law, construction of a contract, where material facts are undisputed, is a question of law for the court. "The interpretation of an insurance policy, as applied to undisputed facts, is a question of law." *National Union Fire Ins. Co. v. Guam Hous. & Urban Renewal Auth.*, 2003 Guam 19, ¶ 13 (adopting and quoting *Cort v. St. Paul Fire & Marine Ins. Co.*, 311 F.3d 979, 982 (9th Cir. 2002)). "A court's interpretation of the terms and coverage of an insurance policy is a question of law and therefore appropriately resolved on summary judgment." *Id.* (quoting *Brown & Lacounte, LLP v. Westport Ins. Corp.*, 307 F.3d 660, 662 (7th Cir. 2002)).

*Sanchez v. TakeCare Ins. Co., Inc.*, 2010 WL 5148074 at *5 (D. Guam Dec. 13, 2010).

In pertinent part, Section IV ("Comprehensive Medical Expense Benefit") of the Policy provides that "[i]f, as a result of a Covered Injury . . ., a Covered Person incurs Covered Medical Expenses as specified, this Policy will pay the Usual, Customary and Reasonable charges for necessary services[.]" Decl. F. Campillo, Ex. A at 27, ECF No. 24-1. "The benefits payable [under the Policy, however,] shall not exceed the Maximum Benefit and are *subject to all limitations and conditions of [the] Policy*." *Id.* (emphasis added). Section III.B of the Policy specifies that "[a]ll benefits are payable based upon Usual, Customary, and Reasonable (UCR)[16] fees which may or may

---

[16] The Policy defines the term "UCR" as follows:

**Usual, Customary and Reasonable (UCR)**: Charges made for services or supplies, as covered under the Plan, essential to the care of the Covered Person shall be defined as "Usual Customary and Reasonable" if they are the amount normally

not be the actual charge and are subject to the maximum specific amount shown in this Policy and Policy Specifications." *Id.* at 23. The Policy also contains a provision concerning the Plaintiff's deductible. "The Comprehensive Medical Expense Deductible shall be Covered Medical Expenses incurred during a Policy Period for which no benefits are payable in an amount equal to the Deductible listed in the Policy Specifications for each Covered Person and/or Family. *Id.* In this case, the Plaintiff's deductible was $500 pursuant to Ms. Matanguihan's February 1, 2014 letter.[17] *See* Decl. J. Razzano, Ex. A, ECF No. 31.

Here, as noted above, the parties agree that Plaintiff's heart attack in December 2013 was a medical incident that was covered under the terms of the Policy. Additionally, despite Mr. Campillo's earlier statement that the Plaintiff's medical incident "appeared to be a foreseen event," there is no dispute that Calvo's treated all of Plaintiff's treatment at St. Francis Hospital for the time period at issue as emergency treatment from a non-participating provider. Decl. F. Campillo at ¶15, ECF No. 24. Thus, the question before the court is what coverage is available for this emergency treatment under the Policy.

With regard to hospital emergency room benefits, the Policy at Section III - Schedule of Insurance, states that "[c]overed medical expenses for use of a Hospital Emergency Room when required for the treatment of a medical emergency, as defined in this Policy, will be covered at the percentage shown on the Policy Specifications." In turn, Section XXIII - Policy Specifications

---

> charged by providers with like training and experience for similar services and supplies within a geographic area, *and* if applicable, *do not exceed the amount ordinarily paid by Medicare* to participating providers for similar services and supplies within a geographic area where the services are rendered or the supplies are received. In determining whether charges are "Usual Customary and Reasonable," due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual circumstances which require additional time, skill or expertise.

*Id.* at 22 (Section II - Definitions, ¶95) (emphasis added).

[17] Ms. Matanguihan's $500 deductible amount differs from the $300 deductible figure set forth in the Policy at Section XXIII - Policy Specifications. *See* Decl. F. Campillo, Ex. A at 9, ECF No. 24-1. The Plaintiff, however, does not appear to contest the amount of the deductible.

provides that when an insured goes to a participating provider, his Hospital Emergency Room benefits (including "physician services, laboratory, [and] x-rays") would require that he pay a "$100 Co-Payment." Decl. F. Campillo, Ex. A at 10, ECF No. 24-1. If, however, the insured goes to a non-participating provider, then he will be required to pay "$100 Co-Payment*."[18] *Id.* The Policy Specifications provided to the court does not include any explanation of any limitation or condition that the asterisk may refer. One could argue, then, that this provision of the Policy is ambiguous. Without any other guidance, the court is left to "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian*, 63 F.3d at 840. The Ninth Circuit has further instructed courts to,

> not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy. Further, we examine the contract as a whole and if, on the face of the contract, two reasonable and fair interpretations are possible, an ambiguity exists. If an ambiguity exists, we must resolve it in favor of the insured.

*Id.* (internal quotations and citations omitted).

The court first turns to the Member Handbook for guidance in interpreting the "$100 Co-Payment*" set forth in the Policy Specifications. *See* Decl. F. Campillo, Ex. B, ECF No. 24-2. Copies of this handbook was given to Allied Pacific in 2012 in sufficient numbers so that all employees who were insured under the Policy should have received a copy. Decl. F. Campillo at ¶18, ECF No. 24. The "Obtaining Care" section of the Member Handbook states:

> **Non-Participating Providers**
> Expect to pay more for services that you obtain through Non-Participating Provider. Refer to "Your Payment Responsibilities" section of this handbook for a more detailed explanation.
>
> **Emergencies**
> Calvo's SelectCare covers emergency medical services provided by either Participating Providers or Non-Participating Providers. Although the Co-Payment/Co-Insurance amount indicated on the Schedule of Benefits is the same for Participating and Non-Participating Providers, the actual amount you may be responsible for may differ. Please see "Important Information on Non-Participating Providers" for more details.

---

[18] Asterisk ("*") in original.

> *Emergencies incurred at non participating providers will be covered as if the emergency services were provided through a participating provider and the cost-sharing component of the charged fee may not exceed the cost-sharing component of the fee or payment if the care was obtained in-network.* However, out-of-network providers may "balance bill" the patient for the difference between the provider's charges and what has been paid by the plan and the patient in the form of a co-payment or co-insurance.

Decl. F. Campillo, Ex. B at 6, ECF No. 24-2 (emphasis in italics added).[19]

Under the "Your Payment Responsibilities" section, the Member Handbook provides:

> **Important Information on Non-Participating Providers**
> Your plan has a deductible for services rendered by Participating Providers, and a separate deductible for service rendered by Non-Participating Providers. You will have to meet the applicable deductible specifically for Non-Participating Providers before the Plan Pays for any eligible charges.
>
> *The coverage provided by the Plan for Non-Participating Providers is normally much less than the coverage provided for Participating Providers.* This is because the Eligible Charges are based on the amount that Medicare reimburses its participating providers in the geographical area where the services are rendered, and are not based on the actual charges. *Actual charges from a Non-Participating Provider are normally significantly higher than Medicare rates and the plan will not pay for these differences.*

Decl. F. Campillo, Ex. B at 7, ECF No. 24-2 (emphasis in italics added).

Reading the above provisions of the Member Handbook in conjunction with the Policy's Specification's "$100 Co-Payment*" provision for hospital emergency room benefits at non-participating providers clears up any claimed ambiguity. The court interprets this provision to mean that the emergency incident Plaintiff experienced in New York would be covered as if the emergency services were provided through a participating provider and the cost-sharing component of the charged fee could not exceed the cost-sharing component of the fee or payment if the care was obtained in-network.

Here, as explained by Mr. Campillo, Calvo's used the fee schedule for Good Samaritan Hospital in Los Angeles – a participating provider in the United States – to determine the amount to be paid to St. Francis Hospital. Calvo's could have limited its coverage to the amount that Medicare would have reimbursed (which it determined to be $72,100.85), but it opted instead to

---

[19] The Member Handbook also sets forth an Example similar to the example included in Ms. Matanguihan's February 1, 2014 letter to St. Francis Hospital.

pay the higher amount ($207,602.56). It is common practice for an insurer to pay a reduced benefit amount when an insured uses an out-of-network provider. The Plaintiff was warned to expect a difference in coverage between participating and non-participating providers. It is unreasonable for the Plaintiff to expect Calvo's to pay for charges at St. Francis Hospital which exceeded what Calvo's would have paid one of its participating provides, especially since the Member Handbook clearly informed the Plaintiff that "[t]he coverage provided by the Plan for Non-Participating Providers is normally much less than the coverage provided for Participating Providers." Decl. F. Campillo, Ex. B at 7, ECF No. 24-2.

The Plaintiff's Opposition claims there is ambiguity in the Policy's "Usual, Customary and Reasonable" provision and the manner in which Calvo's has discretion to calculate the ultimate payments owed. *See* Opp'n at 6-7, ECF No. 29. The Plaintiff asserts that "the [P]olicy does not state Calvo's reserves the discretion to calculate their ultimate liability," and without such a provision in the Policy specifically "identifying Calvo's ability to use its own discretion, the [P]olicy's usual, customary and reasonable provision is ambiguous." *Id.* at 7. The Plaintiff contends that "[r]easonable persons could disagree as to who is making the determination, whether it would be Calvo's or some other relevant individual."

The court finds no merit to this argument. As noted in footnote 16, *supra*, the Policy's definition of Usual, Customary and Reasonable specifically states that [i]n determining whether charges are "Usual Customary and Reasonable," due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual circumstances which require additional time, skill or expertise." Decl. F. Campillo, Ex. A at 22 (Section II - Definitions, ¶95), ECF No. 24-1. This language unambiguously grants the insurer – Calvo's – the discretionary authority to consider the factors specified in deciding what charges for medical services or supplies would be considered "Usual, Customary and Reasonable" and thus covered under the Policy.

As the Defendants further note, the Plaintiff has not shown how Calvo's abused its discretion. Reply at 4-5, ECF No. 34. The court is cognizant that because the validity of benefit claims under an ERISA plan is likely to turn on the interpretation of plan at issue, "a denial of

benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" in which the reviewing court must apply an abuse of discretion standard. *Firestone Tire & Rubber Co.*, 489 U.S. at 115. In the present case, the Plaintiff has not shown how Calvo's exercised its discretion to reduce coverage otherwise afforded to him under the Policy. The facts presented indicate that when Calvo's exercised its discretion, it did so for the Plaintiff's benefit, paying more than what the Plaintiff would have received had Calvo's used the Medicare rates. Thus, the court finds no abuse of discretion by the Defendants.

The court finds no ambiguity in the Policy's provisions and further finds that the Defendants have made all payments required by the Policy. Accordingly, the court recommends that summary judgment be entered for the Defendants as to the Breach of Contract claim in the SAC.

2. <u>Equitable estoppel and ERISA</u>

Although the court has found that the Defendants have not breached the terms of the Policy, the Plaintiff appears to assert an equitable estoppel argument and contends that as a result of the statements made by Ms. Almazan and Ms. Matanguihan, he was led to believe that his insurance coverage would be more than what Calvo's eventually paid St. Francis Hospital. He contends that summary judgment is not appropriate since there is a factual dispute over whether the representations of the Defendants and their agents constituted interpretations of Policy.

Ninth Circuit case law has established four federal common law elements of equitable estoppel applicable in ERISA actions:

> (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 912, 821 (9th Cir. 1992) (quoting *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1096 (9th Cir. 1985).

To these common law elements, the Ninth Circuit has added additional requirements that a plaintiff seeking equitable estoppel in the ERISA context must meet.

First, we have consistently held that a party cannot maintain a federal equitable

estoppel claim in the ERISA context when recovery on the claim would contradict written plan provisions. This principle is derived from ERISA's requirement that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The purpose of this requirement is to protect the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan. Accordingly, a plaintiff may not bring an equitable estoppel claim that would result in a payment of benefits that would be inconsistent with the written plan, or would, as a practical matter, result in an amendment or modification of a plan, because such a result would contradict the writing and amendment requirements of 29 U.S.C. §§ 1102(a)(1) and (b)(3). For the same reason, oral agreements or modifications cannot be used to contradict or supersede the written terms of an ERISA plan. Nevertheless, we have distinguished between oral statements that contradict or supersede the terms of an ERISA plan and oral interpretations of a plan's provisions that are not contrary to the plan's written provisions, and may give effect to interpretations of ambiguous plan provisions.

Second, we have held that an ERISA beneficiary must establish extraordinary circumstances to recover benefits under an equitable estoppel theory. . . .

Accordingly, to maintain a federal equitable estoppel claim in the ERISA context, the party asserting estoppel must not only meet the traditional equitable estoppel requirements, but must also allege: (1) extraordinary circumstances; (2) that the provisions of the plan at issue were ambiguous such that reasonable persons could disagree as to their meaning or effect; and (3) that the representations made about the plan were an interpretation of the plan, not an amendment or modification of the plan.

*Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 955-57 (9th Cir. 2014) (internal quotations and case citations omitted).

Based on Ninth Circuit authority, any oral statements Ms. Almazan allegedly made to Plaintiff's sister or girlfriend that implied full coverage would not support an equitable estoppel claim because such a result would contradict or supersede the written terms of the Policy. As discussed above, the Policy does not provide for "full coverage" of emergency room charges incurred at a non-participating provider. Instead, such emergencies will be covered as if the emergency services were provided through a participating provider so long as any cost-sharing component of the charged fee does not exceed the cost-sharing component of the fee or payment if the care was obtained in-network.

Additionally, the February 1, 2014 letter from Ms. Matanguihan would also not preclude the Defendants from relying upon the terms of the Policy. First, the Plaintiff has failed to show that Ms. Matanguihan's letter was an interpretation of ambiguous language in the Policy rather than a mere mistake in communicating the plan's coverage for emergency services received at a hospital

emergency room of a non-participating provider. On its face, the letter does not provide an interpretation of the Policy, but merely provides erroneous information[20] about the Plaintiff's coverage. Second, the Plaintiff has not shown that he relied on information in Ms. Matanguihan's letter to his detriment. The letter was dated on February 1, 2014 – after the Defendant had already received the emergency medical services at St. Francis Hospital in December 2013 and January 2014. Finally, even if the Plaintiff was able to satisfy all the other requirements of an equitable estoppel claim, the Plaintiff has not shown how he was injured by the written representations in the letter. Ms. Matanguihan did not represent that the plan would cover 70% of all charges. Instead, the letter stated that the Plan would cover 70% of all *eligible charges,* and specified that "eligible charges for non-participating providers are limited to the *lesser* of actual charges or Medicare's participating provider fee schedule in the geographic location where the services was rendered." Decl. J. Razzano, Ex. A, ECF No. 31. Here, the evidence before the court shows that the applicable Medicare fee schedule ($72,100.85) is less than the actual charges Plaintiff incurred at St. Francis Hospital ($501,256.70). *See* Decl. F. Campillo, Ex. E at 1-2, ECF No. 24-5. The Defendants have already paid $207,602.56, which is more than "70% of eligible charges." *Id.*

Accordingly, the court finds that the Plaintiff can not avail himself of an equitable estoppel claim since the representations by the Defendants and their agents did not constitute an interpretation of ambiguous language in the Policy but rather merely provided information – albeit mistaken information – about the Plaintiff's insurance benefits.

## RECOMMENDATION

For the reasons stated herein, the court recommends Chief Judge Manglona **GRANT** the Defendants' Motion for Summary Judgment as to the breach of contract claim. In light of the court's recommendation, the court vacates the Preliminary Pretrial Conference scheduled for

///

---

[20] As noted in footnote 10, Ms. Matanguihan's representation that the plan would pay for 70% of eligible charges (with eligible charges being limited to the lesser of the actual charges or Medicare's participating provider fee schedule) is not the consistent with the Section XXIII - Policy Specifications of the Policy which shows a different payment rate for medical services received at a hospital emergency room.

September 14, 2018, and further recommends that Chief Judge Manglona vacate the trial herein and associated deadlines pending a final ruling on the Motion for Summary Judgment.

IT IS SO RECOMMENDED.



**/s/ Joaquin V.E. Manibusan, Jr.**
    **U.S. Magistrate Judge**
**Dated: Sep 13, 2018**

### NOTICE

**Failure to file written objections to this Report and Recommendation within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking such Report and Recommendation before the assigned United States District Judge.  28 U.S.C. § 636(b)(1)(B).**